IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANNETTE GANTNER, O/B/O M.J., a minor,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1]<br><br>Defendant. | No. 16 C 10531<br><br>Magistrate Judge Sidney I. Schenkier |

# MEMORANDUM OPINION AND ORDER[2]

Plaintiff Annette Gantner ("Ms. Gantner"), on behalf of her minor great-nephew, M.J. ("MJ"), has filed a motion for summary judgment and memorandum in support seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying MJ's application for Supplemental Security Income Benefits ("SSI") (doc. #22: Pl.'s Mot. for Summ. J.) (doc. # 23: Pl.'s Br. in Supp. of Reversing the Decision of the Comm'r of Soc. Sec. ("Pl.'s Mem.")). The Commissioner filed her own motion seeking affirmance of the decision denying benefits (doc. # 24: Comm'r's Mot. for Summ. J.) (doc. # 25: Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.")). Ms. Gantner also filed a reply (doc. # 26: Pl.'s Reply to Def.'s Resp. and Mot. for Summ. J.). For the following reasons, we grant Ms. Gantner's motion and deny the Commissioner's motion.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Nancy A. Berryhill as the named defendant.

[2] On December 8, 2016, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 9).

**I.**

Ms. Gantner, MJ's legal guardian, applied for SSI on MJ's behalf on June 6, 2013 with an alleged disability onset date of November 13, 2003 (R. 19, 153-54). The application was denied initially on September 17, 2013, and upon reconsideration on March 7, 2014 (R. 19). Upon timely request, a hearing was held before an Administrative Law Judge ("ALJ") on May 13, 2015 (*Id.*). The ALJ issued an unfavorable decision on June 5, 2015, finding that MJ is not disabled (R. 19-32). The Appeals Council then denied Ms. Gantner's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-6). *See* 20 C.F.R. § 404.981; *Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012).

**II.**

MJ was born on November 13, 2003 and was 11 years old at the time of the hearing before the ALJ (R. 22-23). MJ has a twin brother as well as an older brother and a sister (R. 53). MJ and his three siblings were removed from their parents' care in 2012 by the Department of Children and Family Services ("DCFS") and have lived with Ms. Gantner, their aunt and legal guardian, since that time (R. 23, 25, 63). MJ's father visits him at Ms. Gantner's home, but MJ's mother is no longer allowed to visit the home because of an incident that occurred with Ms. Gantner in March 2015 (R. 23, 52).

The medical record here is rather sparse, with treatment notes only from Family Christian Health Center, dated December 18, 2012 through January 25, 2013, describing MJ's sinusitis diagnoses and follow-up care (R. 347-368). Instead, the record focuses on school records addressing MJ's learning disabilities, behavioral, and social-emotional difficulties. To that end, the record contains numerous school assessments, Individualized Education Programs ("IEP"), Teacher Questionnaires, and psychological consultative and speech-language evaluations.

Through the process of applying for SSI benefits, MJ was diagnosed with attention deficit hyperactivity disorder ("ADHD") in August 2013 after undergoing a psychological consultative examination by an agency doctor (R. 376).

MJ was also diagnosed with a speech and language delay. He struggles with some core subjects in school and receives special education services (R. 212, 223, 235, 371-72). MJ's learning disability stems from his impulsiveness, inattentiveness and distractibility, and how those conditions affect the various areas of his life (R. 214, 224, 223).

Beginning in December 2009 (when he was six years old), MJ underwent a Speech and Language Assessment wherein David Sheldon ("Mr. Sheldon"), a speech/language pathologist, reported that MJ demonstrated mild to moderate delays in language comprehension, auditory processing and oral expression (R. 243). Mr. Sheldon opined that these deficits significantly impacted MJ's academic, communicative and social-emotional success (*Id.*). Also in December 2009, School Psychologist Mary Ellen Mauro ("Ms. Mauro") wrote in her interpretive report that MJ's abilities to sustain attention, concentrate, and exert mental control were a weakness that affected his nonverbal reasoning abilities (R. 249). Moreover, she noted that his cognitive ability could not easily be summarized because his nonverbal reasoning abilities were much better developed than his verbal reasoning abilities (*Id.*).

During an IEP conference in November 2012 (when MJ was about nine years old), it was determined that MJ continued to need an IEP for speech and language therapy and social work (R. 211, 214). At school, he received speech/language services throughout the day and 60-minutes of social work services per week (R. 214-15). He met the speech or language impairment criteria for language delay/disorder and pragmatic language (R. 216).

3

In a Teacher Questionnaire dated August 23, 2013, MJ's special education teacher, Bonnie Mattson ("Ms. Mattson") and speech/language pathologist, Theresa Schultz ("Ms. Schultz") noted that they had been teaching MJ on a daily basis for the past two years in a self-contained special education class with daily speech and language therapy imbedded in the classroom (R. 200). They opined that MJ had a slight to serious problem in several areas of the domains (R. 200-05).[3]

Also in August 2013, MJ's school principal, Donna Brown, completed a questionnaire noting that MJ had a history of a speech-language impairment that affected his ability to learn (R. 371-72). For this reason, he was placed in the communication development classroom, supported by a special education teacher and a speech pathologist in the classroom full time (*Id.*). MJ also received social work services (*Id.*). Finally on August 29, 2013, MJ underwent a psychological consultative exam with Dr. J.B. Goebel, Ph.D. ("Dr. Goebel"), where the chief complaint listed on the mental status evaluation and the diagnosis were both identified as ADHD (R. 376, 378).

On February 15, 2014, pursuant to his application for benefits, MJ underwent a speech/language evaluation by Kristin Bilas, MHS CCC-SLP/L ("Ms. Bilas") (R. 379-83). Ms. Bilas reviewed the eligibility/IEP paperwork dated November 28, 2012 and also spoke with Ms. Gantner, who reported that MJ cannot pay attention and will not stop talking and misbehaving (R. 381). Ms. Bilas met with MJ and his siblings, and observed that they all "demonstrated extremely adverse behaviors, using foul language, screaming at each other and their aunt" (*Id.*).

---

[3] The six domains as discussed in greater detail below are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Within each domain, the Teacher Questionnaire asks the teacher to check whether or not the child has problems functioning in the specific domain and, if so, to go on to rate the severity of the problem(s) for several categories of activities within each domain and to also offer additional comments on the child's problem(s) (R. 201-07).

4

Once Ms. Bilas was alone with MJ, "he continued to demonstrate very impulsive, self-directed behavior and did not respond to redirection" (*Id.*). Her final summary and impression of MJ was that he would "continue to benefit from structured, small-group learning along with direct speech therapy and social work to increase the overall attention to improve auditory comprehension and pragmatic skills" (R. 383).

On March 4 and 5, 2014, the state agency speech pathologist, Diane Lowry ("Ms. Lowry"), and psychological consultant, Dr. R. Leon Jackson ("Dr. Jackson") reviewed the evidence in the record up until that point in time and issued their Disability Determination Explanation at the Reconsideration level finding MJ not disabled (R. 78-86). Neither Ms. Lowry nor Dr. Jackson examined MJ prior to forming their opinions (R. 25, 78-86).

At an IEP conference in November 2014, it was recommended that MJ remain in the communication development program for the remainder of the 2014-15 school year (R. 327). For the 2015-16 school year (when MJ would be 12 years old), placement reintegration in his home school was discussed and suggested by the team, which noted that MJ's home school now offers resources sufficient to support MJ's academic and social needs (*Id.*).

On May 4, 2015, MJ's special education teacher, Kimberly Wajciechowski ("Ms. Wajciechowski"), completed a teacher questionnaire opining on MJ's overall functioning (R. 304-311). She noted that she had known MJ for approximately one year and saw him five days a week for the subjects of science, social studies and language arts, as he was mainstreamed for reading and math (R. 304). She assessed him on six different domains, which allowed for a student to be rated in each domain as having "No Problem," "A slight problem," "An obvious problem," or "A serious problem."

5

In the domain of Acquiring and Using Information, Ms. Wajciechowski rated MJ in the ten activities that compromise that domain as having a "slight problem" in five activities, "obvious problem" in three activities and a "serious problem" in two activities, and noted that he is "very impulsive" (R. 305). In the domain of Attending and Completing Tasks, she rated MJ as having a "slight problem" six times, an "obvious problem" three times, a "serious problem" three times, and a "very serious problem" one time out of the thirteen activities (R. 306). Ms. Wajciechowski again noted that MJ's impulsiveness causes him to miss out on key details, and that he works at an extremely slow pace (*Id.*). For the domain of Interacting and Relating with Others, Ms. Wajciechowski rated MJ as having "no problem" two times, a "slight problem" six times, an "obvious problem" four times, and a "serious problem" one time with a daily frequency for all but two of the thirteen activities (R. 307). She noted that MJ has a behavior chart that he takes with him to his mainstream classes, that he has support to interpret social situations, and that the social worker and team of teachers uses the social thinking curriculum with MJ (*Id.*). In the domain of Moving About and Manipulating Objects, MJ was rated with "no problem" twice and a "slight problem" five times and it was noted that he does not receive occupational therapy but does benefit from some of its strategies (R. 308). For the domain of Caring for Himself, MJ was rated "no problem" four times, a "slight problem" four times, an "obvious problem" one time and a "serious problem" once in the ten different activities, and it was noted that MJ has "trouble controlling his anger / frustration;" he was caught banging his head against the glass, kicking another student, and the teachers are aware of several fights that occur at home between MJ and his twin brother (R. 309). In the final domain of Medical Conditions and Medications, it was checked that MJ wears glasses and he does not take medication on a regular basis (R. 310).

## III.

At the hearing before the ALJ on May 13, 2015, MJ and Ms. Gantner testified. MJ testified first, and began by describing school and daily activities. He testified that he was 11 years old and in the fifth grade (R. 42-43). He stated he likes math, social studies, science, recess, gym, spelling and reading (R. 43). MJ does not like "hard" homework and did not like the book they were reading at school because the vocabulary was difficult for him (*Id.*). MJ stated that he has ten students in his class with three teachers (R. 43-44). He explained that his other class (mainstream) has more students in it (R. 44). MJ is not in the same class as his brother and he stated that when they were in the same classroom, he would get in trouble for talking too much to his brother (*Id.*). MJ stated that there are "things" that need to change about him but he did not know what those "things" are (*Id.*). MJ discussed that he will speak out in class without raising his hand first and that he keeps forgetting things (R. 45).

When MJ is not in school, he likes to play video games (R. 45). At home, he has gotten in trouble for slamming the door and using profanity for which he is "banned" from playing his video games (R. 45-46). He stated that he does not have chores to do at home (R. 46). He does not have friends in the neighborhood but he has friends at school (R. 47). In the summer, he plays video games and attends summer camp where he enjoys swimming and field trips (R. 47-48).

Ms. Gantner testified next (R. 51). DCFS appointed her MJ's legal guardian in 2012 (R. 63). Ms. Gantner is retired, and lives with MJ and his three siblings in her two-bedroom trailer (R. 53, 63). She receives public aid and some limited financial assistance from MJ's father and her church (R. 64).

Ms. Gantner testified that MJ sees his father and they say their prayers together (R. 52). MJ's mother does not visit Ms. Gantner's home anymore because they had an "incident" in March, 2015 where MJ's mother "beat ... up" Ms. Gantner (*Id.*). Ms. Gantner testified that MJ's behavior changes and is worse after interactions with his parents, and that MJ is "excitable" (*Id.*). MJ also swears at home and he and his twin brother fight and physically hit each other but Ms. Gantner believes the fighting is "typical" sibling behavior (R. 53-54, 58). Ms. Gantner disciplines MJ by taking his video games and computer away from him for a period of time (R. 58).

Ms. Gantner testified that MJ is getting As and Bs in school but he does have behavioral issues (R. 53). He was written up and received detention for talking back to the teacher (*Id.*). MJ was also written up for his behavior on the school bus (R. 59). School has been better for MJ now that he is in a separate classroom from his twin brother (R. 53-54). MJ is "good" about doing his homework (R. 55). His big issue at school is talking out of turn; "he can't wait to get his message across" (R. 56-57). Ms. Gantner attends parent teacher conferences and described that MJ receives accommodations and help at school (R. 57). He is in a smaller classroom but will be in a mainstream classroom next year (*Id.*).

Ms. Gantner stated that MJ only takes allergy medication and she does not think he needs any medication (R. 54). MJ spends about three to four hours a night playing video games (R. 54-55). He has one friend in the neighborhood and Ms. Gantner believes he has friends at school (R. 55). He is talkative and will talk about his day and the kids in school (R. 56). MJ attends a special needs day camp for three weeks in the summer (R. 59-60). Ms. Gantner also takes MJ to the library and park where his interaction with other children is good but not excellent (R. 60-

8

61). MJ is very "excited" when they are out at a store (R. 61). MJ also talks during church services but he has been better at not interrupting the service lately (R. 67).

IV.

On June 5, 2015, the ALJ issued a written opinion finding MJ not disabled under section 1614(a)(3)(C) of the Social Security Act (R. 16-36). Within the meaning of the Social Security Act, a child (defined as an individual under the age of 18) is disabled if he has a "physical or mental impairment, which results in marked and severe functional limitations, and ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Whether a child meets this definition is determined via a multi-step inquiry. 20 C.F.R. § 416.924(a); *Giles v. Astrue*, 483 F.3d 483, 486-87 (7th Cir. 2007). At Step One, the ALJ must determine whether the claimant has engaged in substantial gainful activity ("SGA"). *Id.* If he has not engaged in SGA, then the ALJ determines at Step Two whether the claimant has a severe impairment or combination of impairments. *Id.* If so, then the ALJ determines at Step Three whether the claimant has an impairment(s) that meets, or is medically or functionally equivalent to, one of the listings of impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

To determine if an impairment is functionally equivalent to a listing, an ALJ analyzes the severity of the impairment in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1); *Giles*, 483 F.3d at 487. To functionally equal the listings, the ALJ must find an "extreme" limitation in one category or a "marked" limitation in two categories. 20 C.F.R. § 416.926a(d); *Giles*, 483 F.3d at 487. A "marked" limitation exists when the impairment seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." 20

C.F.R. § 416.926a(e)(2)(i); *Giles*, 483 F.3d at 487. An "extreme" limitation exists when a child's "impairment(s) interferes *very seriously* with [his] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(i) (emphasis added).

In this case, at Step One, the ALJ found that MJ is a school-age child who has not engaged in SGA since his application date of June 6, 2013 (R. 22). At Step Two, the ALJ found that MJ has the following severe impairments: ADHD, and speech and language delay (*Id.*). At Step Three, the ALJ found that MJ does not have an impairment or combination of impairments that meets or medically equals the severity of the following listings: Section 112.10 (Autism Spectrum Disorder) and 112.11 (Neurodevelopmental disorders) (*Id.*). The ALJ stated her conclusion was supported by the state agency psychological consultants that reviewed the record and reached the same conclusion in their 2013 and 2014 reports (*Id.*). At Step Three, the ALJ also found that MJ does not have an impairment or combination of impairments that functionally equals the severity of the listings, giving significant weight to the state agency psychological consultant, Dr. Jackson, and speech pathologist, Ms. Lowry's, respective opinions, who reviewed the majority of the evidence prior to forming their opinions in 2014 (R. 22, 25). The ALJ opined that the "records that were submitted after the hearing do not show any worsening in the claimant's condition" (R. 25). Thus, she found a *less than marked limitation* in acquiring and using information, in attending and completing tasks, and in interacting and relating with others and *no limitation* in moving about and manipulating objects, caring for himself, and health and physical well-being (R. 28-32). Accordingly, the ALJ found MJ not disabled.

## V.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013). This Court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

We focus here on Ms. Gantner's argument that the ALJ erred in failing to submit post-March 2014 evidence to the state agency reviewing physicians, or to call upon a medical expert to testify at the hearing (Pl.'s Mem. at 5). Specifically, the following evidence was added to MJ's casefile after the state agency personnel rendered their opinions in March, 2014: (1) the Teacher Questionnaire from Ms. Wojciechawski, MJ's special education teacher, dated May 4, 2015; (2) Education Records dated November 20, 2014 and May 13, 2015, from MJ's school's community development program; and (3) an IEP dated January 18, 2015 (R. 304-340, 384-386). Similarly, MJ argues that the ALJ erred in failing to assign weight to the opinion of MJ's special education teacher, Ms. Wojciechawski (Pl.'s Mem. at 7).[4]

---

[4] MJ also argues that the ALJ erred in failing to find that MJ had a marked limitation in the domain of attending and completing tasks and that the ALJ erred in evaluating the subjective allegations of the Plaintiff's legal guardian, Ms. Gantner (Pl.'s Mem. at 11, 15). Because we remand on MJ's first two arguments, we need not address the remaining arguments.

11

We agree with Ms. Gantner that the ALJ should have sent the post-March 2014 evidence to the state agency consultants or called upon a medical expert to testify at the hearing to ascertain MJ's functional limitations. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (remanding where ALJ "fatally" failed to submit new and potentially decisive medical evidence to medical scrutiny for review); *See also Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (finding ALJ erred by relying on non-examining physician's outdated assessment and by evaluating, without expert assistance, the significance of new report showing the need for a hip replacement and evidence of further spinal degeneration).

ALJs may use evidence from "other sources" including educational personnel such as school teachers and counselors to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. SSR 06-03p; 20 CFR 416.913(a).[5] Agency rules "stress[] that an ALJ should 'consider *all* of the available evidence in the individual's case record,' including even non-medical sources such as teachers." *Brown v. Astrue*, No. 12 C 1750, 2012 WL 6692139 *7 (N.D. Ill. Dec. 19, 2012) (emphasis in original) *citing* SSR 06-03p. These non-medical sources, such as teachers and school counselors, can be valuable sources of evidence for assessing impairment severity and functioning. SSR 06-03p; 20 CFR 416.913(a). In deciding the weight to be given to the non-medical sources, relevant factors to consider include how long the source has known and how frequently the source has seen the individual; consistency of the opinion with other evidence, presentation of relevant evidence, explanation of the opinion, whether the source has a specialty or area of expertise related to the individual's impairment and other factors. *Id.*

---

[5] Although SSR 06-03p was rescinded by the Agency for claims filed on or after March 27, 2017, that rule applies in the present case.

In this case, when comparing MJ's special education teacher's questionnaire from 2015 with his special education teacher's questionnaire from 2013, there is support for MJ's argument that his condition worsened. For example, when comparing his ability to comprehend oral instructions, understand and participate in class discussions and apply problem-solving skills in class discussions, MJ was rated a "slight problem" in 2013 but an "obvious problem" in 2015 (R. 200, 305). In 2013, MJ had a "slight problem" in focusing long enough to finish an assigned activity or task and organizing his own things or school materials but in 2015 he had an "obvious problem" (R. 202, 306). In 2013, MJ had an "obvious problem" paying attention when spoken to directly but in 2015 he had a "serious problem" (R. 202, 306). MJ was rated in working at reasonable pace/finishing on time with an "obvious problem" in 2013 but a "serious problem" in 2015 (R. 202, 306). Finally, in 2013, MJ had a "slight problem" in playing cooperatively with other children but a "serious problem" in 2015 (R. 203, 307).

The ALJ failed to explain why these assessments did not indicate a worsening in MJ's condition, and did not warrant review by agency consultants. Instead, the ALJ summarily stated that the records submitted after the hearing "did not show any worsening in the claimant's condition" (R. 25). The ALJ offered no explanation for that conclusion. There surely are aspects of the 2015 evaluation that support that summary conclusion. However, an ALJ may not "cherry pick" from the record the evidence supporting a conclusion and disregard evidence to the contrary. *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016). Moreover, an ALJ must explain the logical pattern from the evidence to her conclusions. *Pepper*, 712 F.3d at 362. Here, the ALJ's approach violated both of these well-settled principles.

And, even if the ALJ had explained why she concluded the post-hearing records did not support a finding of disability, it would not have been sufficient for the ALJ to make that

13

assessment of the additional evidence without the assessment of experts. "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves" and not succumb to the temptation to play doctor. *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). The same holds true for findings by other trained professionals who, while not medical sources, have specialized knowledge on which they draw. Indeed, we note the irony in the ALJ finding the agency experts' opinions worthy of significant weight, even though they never examined MJ, because they "had the advantage of reviewing the *majority* of the evidence prior to forming their opinions" (R. 25) (emphasis added), but then failing to obtain updated assessments based on more recent records from people who had significant contact with MJ. On remand, the ALJ must correct this error.[6]

---

[6] We comment on one other aspect of the ALJ's decision. The ALJ gave significant weight to testimony that MJ played video games for up to four hours a night, and the ALJ opined that that suggested MJ's "attention span (was) not markedly limited" (R. 25-26). The ability to play video games, however, is not necessarily an indicator of whether or not MJ is limited in the functional equivalence domains:

> Some children with impairments can attend to some tasks, but not to all tasks in all settings. Such children may exhibit "hyperfocus," an intense focus on things that interest them, such as video games, but be limited in their ability to focus on other tasks. These kinds of limitations in the domain of "Attending and completing tasks" are common in children with AD/HD.

SSR 09-4P, 2009 WL 396033 *3; *See also Taylor v. Colvin*, 829 F.3d 799, 801 (7th Cir. 2016) (expressing doubt that "playing video games requires the same level of concentration as working full time"); *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015) (playing video games is not "compelling evidence of whether or not one is employable"); *M.W. ex rel. Terry v. Astrue*, No. 10 C 7813, 2012 WL 1532386 *13 (N.D. Ill. Apr. 30, 2012) (finding "it may be true that MW could focus enough to play video games, but that fact alone is not enough to trump the evidence that MW had problems" in the area of attending and completing tasks). On remand, the ALJ must do more than recite the evidence that MJ plays video games; the ALJ must explain why that evidence shows – in the context of all the relevant evidence – that MJ does not have a marked limitation in attention span.

## CONCLUSION

For the reasons stated above, we grant Ms. Gantner's motion for summary judgment (doc. # 22) and deny the Commissioner's motion for summary judgment (doc. # 24). This case is remanded for further proceedings consistent with this opinion.

**ENTER:**

/s/ Sidney I. Schenkier
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:** December 18, 2017